**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kristy Pruett,<br><br>    Plaintiff,<br><br>vs.<br><br>State of Arizona, a public entity; Arizona Game and Fish Commission, an agency of the State of Arizona; and Larry Voyles, in his capacity as Director of the Arizona Game and Fish Department,<br><br>    Defendants. | No. CV-07-1744-PHX-NVW<br><br>**ORDER** |

Plaintiff Kristy Pruett brought this action for a determination that federal disability laws entitle her to keep a chimpanzee in her home as a service animal, overriding Arizona law to the contrary. Both parties move for summary judgment. (Doc. # 99, 100.) The material facts are not in dispute, and the Arizona law stands.

**I.  Background**

Pruett seeks modification of Arizona wildlife regulations, policies, and/or procedures to allow her to remain in possession of a chimpanzee. Pruett is diabetic, would like to use the chimpanzee as a service animal, and requests modification of Arizona statutes and regulations restricting possession of chimpanzees as a reasonable accommodation to her disability under Title II of the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act.

### A. Pruett's Medical Condition

Pruett was diagnosed with juvenile onset diabetes (type 1) when she was eight years old. To treat her diabetes, Pruett takes oral medication every morning and self-administers insulin injections five to seven times per day. She monitors her blood glucose levels as often as ten times per day. Nevertheless, she has periods of hyperglycemia and hypoglycemia. Pruett's diabetes is complicated by gastroparesis, a condition in which the stomach no longer contracts and empties properly, causing delay and variability in the time between eating and the corresponding increase in blood glucose level.

Pruett experiences hypoglycemic unawareness, which means that when her blood glucose level drops, she does not experience the characteristic symptoms of hypoglycemia and therefore does not know that her blood glucose level is becoming too low. During periods of hypoglycemic unawareness, Pruett is not able to take measures to help herself with the management of her diabetes and requires assistance. When Pruett's blood glucose level becomes very low, she becomes lightheaded, dizzy, sweaty, and clammy, her hands and knees shake, and her legs start to give out. An extremely low blood glucose level may cause unconsciousness, which is treated by administering glucose intravenously, by injection, or by spreading a gel inside the mouth. Food or liquid that requires ingestion must not be given to an unconscious person. Hypoglycemic unawareness presents a serious risk when driving or swimming. However, a continuous glucose monitor can be used to warn a person that her blood glucose level is beginning to drop, and an insulin pump can be used in combination with the monitor to provide variable dosing to control blood glucose levels.

Pruett's ex-husband Andrew Sawyer, who resides with Pruett, usually calls Pruett every hour when he is not home, and if she does not answer the telephone, he returns home. When Sawyer is home, he deems himself Pruett's service animal such that she does not need the assistance of a primate. Pruett has had serious hypoglycemic events requiring paramedic treatment even when Sawyer was with her. For example, on April 1,

2008, Pruett experienced a hypoglycemic event that required emergency intravenous treatment by paramedics from a local fire department.

Pruett leaves her home to go grocery shopping, she drove to and attended depositions in this case, and she is able to drive herself to medical appointments although often her father or Sawyer take her. She has traveled frequently to Texas and has left Arizona with Sawyer for vacationing and other purposes.

### B. Communications Between Pruett and the Arizona Fish and Game Department Regarding Possession of a Chimpanzee

For nine and one-half years, Pruett and Sawyer had a Tonkean ape, weighing approximately 42 to 48 pounds, living in their home in Surprise, Arizona. They trained the Tonkean ape to retrieve sugar and press a medical alert button on Pruett's telephone to assist Pruett. After the Tonkean ape died in June 2006, Pruett did not have the assistance of another animal for a year. Non-infant Tonkean apes may be imported into Arizona with a health certification if free of disease, but must be confined to the owner's property except for transportation to a veterinarian or out of the state.

In late 2006, Pruett contacted the Arizona Game and Fish Department ("Department") to notify the Department that her Tonkean ape had died and she planned to replace it. Pruett had several telephone conversations with Jay Cook, a law enforcement program supervisor for the Department responsible for administering wildlife holding licenses and zoo licenses in Region 6, which includes Surprise, Arizona. Pruett informed Cook that the Department had permitted her to take the Tonkean ape with her in public, but Cook could not find any record of Pruett's prior contacts with the Department or of any exception granted to her. In early 2007, Pruett told Cook that she wanted to purchase a chimpanzee, not yet born, to use as a service animal because of her diabetes. Cook informed Pruett that Arizona statutes and regulations, which permit private possession of Tonkean apes, restrict private possession of chimpanzees.

After receiving Pruett's inquiry, Cook researched health and safety concerns of private chimpanzee ownership and application of the ADA to Pruett's circumstances, and

he spoke with a Louisiana professor and a representative of the United States Department of Justice. Over several weeks, Cook gathered information and evaluated Pruett's inquiry about having a chimpanzee in her home. On several occasions, Cook discussed Pruett's request with his supervisor, Rod Lucas, the Department regional supervisor for Region 6, located in Mesa, Arizona. Lucas consulted his supervisor, the assistant director for field operations, to determine whether the Department had received any requests similar to Pruett's.

On March 14, 2007, Pruett sent a letter to Cook stating that she was enclosing the documents he had requested, letters from the chimpanzee's breeder, Pruett's doctor, and the veterinarian who would oversee the care of the chimpanzee. The breeder's letter said that Pruett would be purchasing a chimpanzee to be trained and used as a service animal for diabetes.

Pruett's March 14, 2007 letter also stated that she had contacted the USDA for licensing, was "pre-licensed," and was scheduled to meet with the USDA to "finalize the paperwork and inspection." (Doc. #102-6 at 2.) Her letter also stated that the chimpanzee was due to be born "any day now," and she would be bringing it home as soon as it is born. Pruett's letter did not request a wildlife holding license, but instead said:

> I know the laws and through the ADA you can amend them to accommodate my service animal. I hope this is a smooth process for your department as well as for my sake, but just for you to know, I will not let this go, I know my rights. If there is any thing else you need, please feel free to contact me. If you need to speak to some one at the ADA, please contact one of the lawyers at the Civil Rights Division under the Disability Rights Section.

(*Id.*)

In April 2007, Pruett applied for an exhibitor license from the United States Department of Agriculture ("USDA") under the Animal Welfare Act, 7 U.S.C. § 2131, *et seq.*, for one nonhuman primate. The Animal Welfare Act requires an exhibitor to obtain a USDA exhibitor license for taking an animal in public for public viewing, using the animal in educational programs, breeding, and selling the animal's offspring. Pruett

- 4 -

1  indicated on the application that the nature of her business is "shows."  Pruett's USDA
2  application did not state that she needed a chimpanzee as a service animal.  Pruett thought
3  she may possibly use the chimpanzee in commercials or a documentary film and possibly
4  would take the chimpanzee to schools for the education of young children.

5  In May 2007, Cook sent a letter to Lucas summarizing the events related to
6  Pruett's inquiry with the Department.  Cook's letter states that he had not heard from
7  Pruett since her March 14, 2007 letter.

8  In June 2007, Pruett purchased a two-year-old chimpanzee in Texas for $25,000
9  ("the Chimpanzee").  She flew to Texas and drove back to Arizona with the Chimpanzee.
10 Pruett admits she knew at the time she purchased the Chimpanzee that chimpanzees are
11 restricted wildlife in Arizona.

12 After Pruett brought the Chimpanzee from Texas to Arizona, the USDA conducted
13 two pre-license inspections of Pruett's home.  The USDA requested additional
14 information from Pruett regarding the safety of her exhibition for the Chimpanzee and the
15 public, as well as the prevention of attacks and biting, but did not issue an exhibitor
16 license to Pruett because it needed more information.

17 Because Pruett had informed Cook that she was applying for a USDA exhibitor
18 license, Cook contacted the USDA regarding Pruett.  Cook learned that the USDA had
19 scheduled a visit to Pruett's home.  Cook called the USDA after the visit and learned that
20 the USDA had observed the Chimpanzee in Pruett's home.

21 On July 25, 2007, Lucas sent Pruett a letter denying her request to import and
22 possess the Chimpanzee in her home for her stated purpose of having the Chimpanzee
23 assist her with her diabetic condition.  (Doc. #102-6.)  The letter explained the
24 Department's reasons for the denial:  (1) under Arizona statute and regulation,
25 chimpanzees have been classified as restricted live wildlife because they are inherently
26 dangerous animals capable of transmitting disease and causing serious injury or death to
27 human beings; (2) Arizona law does not allow individuals to possess chimpanzees as pets
28 or service animals, and there is no special license available for these purposes; (3) even if

1  the Department were able to allow Pruett to possess a chimpanzee as a service animal
2  pursuant to the ADA, the information she provided did not establish that she had a
3  "disability" under the ADA or that the Chimpanzee she unlawfully imported into Arizona
4  meets requirements for "service animal" under the ADA; and (4) even if Pruett had
5  provided sufficient evidence to satisfy the ADA's requirements for "disability" and
6  "service animal," the Department still would have denied her request as not a reasonable
7  accommodation in light of the risk to public health, safety, and welfare, and given no
8  evidence that she could not monitor her blood sugar levels absent the aid of the
9  Chimpanzee.  The July 25, 2007 letter further notified Pruett that she had thirty days to
10 export the unlawfully possessed Chimpanzee out of Arizona and to provide evidence that
11 she no longer possessed it.

12     On September 12, 2007, Pruett filed this action alleging discrimination under the
13 ADA and subsequently amended her complaint to add a count under Section 504 of the
14 Rehabilitation Act.  On December 10, 2007, the Department issued a Seizure in Place
15 Directive in which the parties stipulated that Pruett will keep the Chimpanzee within the
16 confines of her residence at all times except to be transported to a licensed veterinarian
17 for treatment or testing with immediate notice to the Department.

18     **C.     The Chimpanzee**

19     Prior to being brought to Arizona, the Chimpanzee worked for the first two years
20 of its life in a variety of entertainment settings such as movies, television programs, a
21 commercial, parties, and special events and has had a full production crew.  When Pruett
22 brought the Chimpanzee into Arizona, it was not trained to assist Pruett with her diabetes
23 and had not been a service animal.  The Chimpanzee is still being trained and will
24 continue to need training throughout its life.

25     Pruett is not physically able to care for the Chimpanzee on her own; Sawyer is the
26 Chimpanzee's primary caretaker.  The Chimpanzee needs its diaper changed
27 approximately six or seven times per day.  It cannot prepare its own food.  Sawyer feeds
28 the Chimpanzee six to eight bottles each night.

1     The Chimpanzee sits with Pruett when she is home alone, retrieves candy or a
2  beverage with sugar for her on command, turns lights on for her, picks up remote controls
3  and telephones, sleeps with her, and gives her mental stimulation.  It is not currently
4  capable of calling for emergency assistance.  It is not currently capable of detecting when
5  Pruett's blood glucose level drops too low or providing her sugar without a verbal
6  command.

7     The Chimpanzee has severe allergic reactions that are unpredictable and
8  sometimes quite serious, even involving anaphylaxis and breathing difficulties.  It has had
9  epileptic seizures and requires an epi pen for epileptic shock due to its allergy.

10    There are very few chimpanzees in private homes.  Possessing a nonhuman
11 primate is like having an eternal three-year-old, and chimpanzees are more challenging to
12 care for and handle than many other primates.  A chimpanzee's average life span is
13 approximately sixty to seventy years.  Adult chimpanzees are large, strong, and often
14 aggressive, and adult males typically reach eighty to two hundred pounds in weight.  The
15 size or weight of a chimpanzee does not necessarily determine its behavior or serve as an
16 accurate predictor of future behavior, including aggression or dominance.  A bond
17 between a human and a chimpanzee does not guarantee there will not be future aggression
18 by the chimpanzee.

19    Pruett believes that having the Chimpanzee neutered will decrease the likelihood
20 that it will become aggressive when it reaches adolescence.  She also believes that the
21 Chimpanzee will become too large to live in her house as a service animal, which usually
22 would be when it is eight to fifteen years old.  At that time, Pruett plans to take the
23 Chimpanzee out of Arizona.

### D.    Relief Sought by Pruett

25    In this action Pruett requests that the Court:  (1) declare Defendants' actions in
26 refusing to modify their regulations, policies, and/or procedures to allow Plaintiff to
27 remain in possession of her service animal have violated Title II of the ADA and Section
28 504 of the Rehabilitation Act; (2) enjoin Defendants from taking any action to remove the

- 7 -

Chimpanzee; (3) order Defendants to provide a waiver of their statute and regulation to allow Plaintiff to retain custody of the Chimpanzee; (4) order the Defendants to establish a written policy providing for reasonable accommodation to Arizona residents with disabilities under which such individuals may apply for a waiver of the regulations banning the import of qualified service animals, including primates; (5) award Pruett compensatory damages for her pecuniary and non-pecuniary losses in an amount to be proven at trial; and (6) award Pruett her reasonable costs and attorneys fees.

**III.   Legal Standards**

**A.   Summary Judgment**

The court should grant summary judgment if the evidence shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party must produce evidence and persuade the court there is no genuine issue of material fact. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000). Where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

**B.   Title II of the Americans with Disabilities Act (42 U.S.C. § 12132)**

Title II of the ADA prohibits discrimination related to public services, which is distinct from Title I's prohibition of employment discrimination and Title III's prohibition of discrimination related to public accommodations. Title II of the ADA provides:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. In Title II, "qualified individual with a disability" means "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids or services, meets the essential eligibility

1  requirements for the receipt of services or the participation in programs or activities
2  provided by a public entity." 42 U.S.C. § 12131(2).
3        To prove a discrimination claim under § 12132, a plaintiff must show:

> (1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against by the public entity; and (3) *such exclusion, denial of benefits, or discrimination was by reason of his disability.*

*Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997). Section 12132 prohibits both outright discrimination against individuals with disabilities and forms of discrimination, including facially neutral laws, that deny disabled persons meaningful access to public services. *Crowder v. Kitagawa*, 81 F.3d 1480, 1483-84 (9th Cir. 1996) (Hawaii's facially neutral 120-day quarantine requirement for all carnivorous animals entering Hawaii disproportionately burdened visually-impaired persons because of their unique dependence on guide dogs and thereby denied them meaningful access to state services, programs, and activities while such services, programs, and activities remained open and easily accessible by others).

      The regulations implementing Title II of the ADA require public entities to make reasonable modifications under certain conditions:

> A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. § 35.130(b)(7). A discrimination claim based on a failure to reasonably accommodate is distinct from a discrimination claim based on disparate impact, and a plaintiff is not required to allege either disparate treatment or disparate impact in order to state a reasonable accommodation claim. *McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004). "[T]he crux of a reasonable accommodation claim is a facially neutral requirement that is consistently enforced." *Id.* "The purpose of the ADA's reasonable accommodation requirement is to guard against the facade of 'equal treatment' when particular accommodations are necessary to level the playing field." *Id.* at 1267.

"[T]he question of what constitutes a reasonable accommodation under the ADA requires a fact-specific, individualized analysis of the disabled individual's circumstances and the accommodations that might allow him to meet the program's standards." *McGary*, 386 F.3d at 1270 (internal quotations and citation omitted).

### C. Section 504 of the Rehabilitation Act (29 U.S.C. § 794)

Section 504 of the Rehabilitation Act provides in part:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States postal service.

29 U.S.C. § 794(a). To prove a discrimination claim under Section 504 of the Rehabilitation Act, a plaintiff must show:

> (1) he is an "individual with a disability"; (2) he is "otherwise qualified" to receive the benefit; (3) he was denied the benefits of the program *solely by reason of his disability*; and (4) the program receives federal financial assistance.

*Weinreich v. Los Angeles County Metropolitan Transportation Auth.*, 114 F.3d 976, 978 (9th Cir. 1997) (footnote omitted).

There is no significant difference in the analysis of rights and obligations created by the ADA and Section 504 of the Rehabilitation Act. *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002); *accord McGary*, 386 F.3d at 1269 n.7. Title II of the ADA expressly provides that the remedies, procedures, and rights set forth in 29 U.S.C. § 794(a) shall be the remedies, procedures, and rights Title II provides to any person alleging discrimination on the basis of disability in violation of 42 U.S.C. § 12132.

### D. Arizona's Regulation of Live Wildlife

The Arizona Game and Fish Department administers the laws of Arizona relating to wildlife. A.R.S. § 17-201. Unless a species is listed as restricted wildlife, it may be lawfully imported or possessed in Arizona. *See* A.R.S. § 17-406. In 1988, the Arizona Game and Fish Commission applied specific criteria for determining which animals should be restricted when it revised its regulations regarding restricted live wildlife. An

1  animal would be restricted only if it were wild, not domestic, and only if it represented an
2  actual or potentially significant threat to indigenous wildlife or to public health and
3  safety. To determine whether an animal represented an actual or potentially significant
4  threat to public health and safety, the Commission investigated whether the animal could
5  carry disease, posed a physical threat, could inflict property damage, and could create a
6  nuisance. The Commission determined that chimpanzees represented an actual or
7  potentially significant threat to public health and safety and classified them as restricted.
8  Therefore, Arizona does not permit the private importation or ownership of chimpanzees
9  without a special license or lawful exemption. A.R.S. § 17-306; Ariz. Admin. Code
10 R12-4-401(24), R12-4-406(G)(4).

11       A wildlife holding license authorizes an individual to possess restricted live
12 wildlife for certain purposes. Ariz. Admin. Code R12-4-417(A). A wildlife holding
13 license may be issued only for the advancement of science, wildlife management, or
14 promotion of public health or welfare; education; commercial photography under certain
15 conditions; to lawfully possess and give necessary humane treatment to abandoned or
16 permanently disabled restricted live wildlife unable to meet its own needs in the wild; or
17 to lawfully possess restricted live wildlife that was possessed under another special
18 license where the primary purpose for that special license no longer exists. Ariz. Admin.
19 Code R12-4-417(B). The Department may issue a wildlife holding license only if it
20 determines that issuing the license is in the best interest of the wildlife, will not adversely
21 impact other wildlife in this state, and does not pose a threat to public health or safety. *Id.*

22 **III.    Defendants' Motion to Strike**

23       Defendants move to strike portions of Pruett's statement of facts in opposition to
24 Defendants' Motion for Summary Judgment. (Doc. #113.) Local Rule LRCiv 7.2(m)(1),
25 which became effective December 1, 2007, prohibits filing a motion to strike unless it is
26 authorized by statute or rule or "it seeks to strike any part of a filing or submission on the
27 ground that it is prohibited (or not authorized) by a statute, rule, or court order." The
28 purpose of LRCiv 7.2(m)(1) is to require unitary briefs, including objections to evidence

- 11 -

1 and to the propriety of arguments, within the page limits or beyond them by leave of the
2 court. Litigants may not divide their briefs and multiply their page limits by styling part
3 of the argument as a separate motion to strike. The Rule was meant to restate existing
4 procedural principles that have been disregarded in some quarters. *Custom Vehicles, Inc.*
5 *v. Forest River, Inc.*, 464 F.3d 725, 727-28 (7th Cir. 2006) (Easterbrook, J., in chambers)
6 (a "motion to strike" that is argument for the lack of merit of the underlying motion is
7 unauthorized and improper); *Redwood v. Dobson*, 476 F.3d 462, 471 (7th Cir. 2007).

8       The objections raised in Defendants' Motion to Strike (doc. #113) fall into two
9 groups. First, Defendants move to strike numerous specific statements as immaterial,
10 lacking evidentiary support, or inadmissible opinion, argument, or hearsay. None of the
11 exceptions to LRCiv 7.2(m)(1)'s prohibition of motions to strike is satisfied here. LRCiv
12 7.2(m)(2) permits Defendants to object in their response to Plaintiff's separate statement
13 of material facts, but they are not permitted to move to strike the alleged facts or exhibits.
14 Therefore, this part of Defendants' Motion to Strike will be denied as procedurally
15 improper.

16       However, Defendants have alternatively styled these points as objections, and as
17 such they must be considered if material. Many of the objections are well taken,
18 especially for lack of materiality or evidentiary support. Nevertheless, it is unnecessary
19 to labor through these voluminous objections one by one, for even taking Pruett's
20 submissions at face value, they show no disputable material fact.

21       Second, Defendants move to strike Plaintiff's argument and explanatory
22 statements filed in response to Defendants' Statement of Facts paragraph numbers 21-23,
23 32-34, 38, 44, 51, 53, 57, 68, 71, 74, 88, 91, 94-95, 100, 103, 111-112, 114, 116, 122-124,
24 131, 133, 135, 137-139, 141-142, 145-146, 151, 153, 162. LRCiv 56.1(b) requires a party
25 opposing a motion for summary judgment to file a statement setting forth:

26     (1) for each paragraph of the moving party's separate statement of facts, a
    correspondingly numbered paragraph indicating whether the party disputes
27     the statement of fact set forth in that paragraph and a reference to the
    specific admissible portion of the record supporting the party's position if
28     the fact is disputed; and (2) any additional facts that establish a genuine

> issue of material fact or otherwise preclude judgment in favor of the moving party. Each additional fact shall be set forth in a separately numbered paragraph and shall refer to a specific admissible portion of the record where the fact finds support.

The Rule requires the controverting party to provide a specific record reference supporting the party's position if a fact is disputed; it does not permit explanation and argument supporting the party's position to be included in the response to the moving party's statement of facts. Argument may be made in the response or reply brief on the motion for summary judgment, but within the page limits. Pruett has included explanation and argument not permitted by the Rule in her response to Defendants' Statement of Facts concerning those numbered paragraphs. Defendants' objections are well-taken, and the Court therefore will disregard each of those paragraphs except for the word "Controverted" and the references to the record.

But again, Defendants were not content with their well-founded objection to these improper arguments, but also moved to strike them, adding their own extended arguments on the substance of each point. This part of the motion to strike has at least arguable textual support in the Local Rule on the theory that the challenged argument is "part of a filing or submission . . . that . . . is prohibited (or not authorized) by a statute, rule, or court order."  However, that reading of the exception in the Local Rule must be incorrect, for it would largely swallow the prohibition of motions to strike as supplemental briefing on a primary motion. All manner of contentions that do not, or arguably do not, fall within the legal standard governing a particular motion could be said to be "not authorized" by the rule allowing the filing of the motion. The place to point that out is in the response or reply brief on the motion itself, or by unelaborated objection in a response to the LRCiv 56.1(b) statement of facts, not by a motion to strike.

The better reading of the exception in LRCiv 7.2(m)(1) permitting motions to strike "any part of a filing or submission on the ground that it is prohibited (or not authorized) by a statute, rule, or court order" is that the "part" of a filing subject to striking must be a separate and discrete motion or filing conjoined with a permitted filing.

- 13 -

1  So, for example, a cross-motion joined with a response to a motion summary judgment
2  filed after the dispositive motion deadline would be subject to a motion to strike as
3  untimely under the case scheduling order.  In this case, Pruett's statement of facts in
4  opposition to Defendants' Motion for Summary Judgment is itself a permitted filing.
5  Only some of the content is improper.  This part of Defendants' Motion to Strike is also
6  prohibited by LRCiv 7.2(m)(1), though the objections are sustained on their merits.

**IV.    Analysis**

Pruett contends that Defendants have violated both Title II of the ADA and Section 504 of the Rehabilitation Act by failing to accommodate her disability by modifying Arizona's regulatory scheme to allow her to lawfully possess in her home a chimpanzee as a service animal.  For purposes of summary judgment, Defendants do not dispute that Pruett is a "qualified individual with a disability" or that she is otherwise qualified to participate in or receive the benefit of the Defendants' services, programs, and activities.  There is no dispute that the State of Arizona, the Arizona Fish and Game Commission, and the Arizona Fish and Game Department are public entities that receive federal assistance.  There is no dispute that Arizona's live wildlife restrictions are facially neutral.  There is no evidence or argument that Pruett has been denied the right to possess restricted wildlife because of her disability.

Both sides strain to define the "services, programs, or activities" of which Pruett may have been denied benefits or participation.  *See* 42 U.S.C. § 12132.  It is not common to conceive of regulatory restrictions on an individual's rights as a "benefit" or a program in which one may "participate."  However, compliance with statutes and regulations may constitute a benefit of the services, programs, or activities of a public entity under Title II of the ADA.  *McGary*, 386 F.3d at 1269.

A wildlife holding license would permit Pruett to comply with Arizona law while possessing an otherwise prohibited chimpanzee if she satisfied certain conditions, which are not met here.  Under regulation, the Department may issue a wildlife holding license only if it determines doing so would not pose a threat to public health or safety.  Ariz.

Admin. Code R12-4-417.  Further, the purpose of the license must be for the advancement of science, wildlife management, or promotion of public health or welfare; education; commercial photography under specific conditions; or for humane treatment of live wildlife.  *Id.*  Pruett does not want to possess the Chimpanzee for any of the identified purposes.  Rather, she wants to possess the Chimpanzee as a service animal:

> Service animal means any guide dog, signal dog, or other animal individually trained to do work or perform tasks for the benefit of an individual with a disability, including, but not limited to, guiding individuals with impaired vision, alerting individuals with impaired hearing to intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or fetching dropped items.

28 C.F.R. § 36.104.  Pruett wants authorization to possess restricted live wildlife equivalent to a wildlife holding license, but for the purpose of using the Chimpanzee as a service animal and in spite of the Department's determination that possession of a chimpanzee in a private home poses a threat to public health or safety.  In essence, Pruett seeks a modification of the requirements for obtaining a wildlife holding license—an exception to the exception—which would enable her to comply with Arizona law by waiving it entirely.

The issue to be determined here is whether Defendants must grant Pruett the waiver she requests to avoid discrimination on the basis of her disability.  A public entity must make "reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).  The Court, therefore, conducts a fact-specific individualized analysis to determine whether the modifications Pruett seeks (1) are necessary to avoid discrimination on the basis of disability, (2) would not fundamentally alter the nature of Arizona statutes and regulations restricting possession of restricted live wildlife, and (3) are reasonable.

### A. The Modifications Pruett Seeks Are Not Necessary to Avoid Discrimination on the Basis of Disability.

Pruett has submitted a medical opinion and other testimony that her disability requires her to have someone with her twenty-four hours a day, seven days a week, to provide her with immediate carbohydrate supplementation if she is unable to provide for this need herself. At times she is not aware that her blood glucose level is becoming too low until she is unable to walk to get carbohydrate supplementation, and she finds it impossible to keep sugar on her twenty-four hours a day, seven days a week. She believes that keeping a telephone near her or wearing a device with a button to call for emergency medical assistance is not sufficient because it would take too long for assistance to arrive.

Pruett believes that it is necessary for her to have the Chimpanzee with her in her home whenever she is otherwise alone. The Chimpanzee currently can retrieve carbohydrate supplementation on verbal command, but it cannot detect when Pruett's blood glucose levels drop or provide carbohydrate supplementation without verbal command. The Chimpanzee cannot currently call for emergency medical assistance. Pruett does not intend to take the Chimpanzee in public and believes she will be able to have someone accompany her whenever she leaves the house.

The Chimpanzee does not currently meet the definition of "service animal" because it is not yet "individually trained to do work or perform tasks for the benefit of an individual with a disability." It has been socialized and is able to retrieve objects on command, as are many household pets that are not service animals, but it is not trained to perform tasks specifically related to Pruett's disability. However, although Pruett seeks to use the Chimpanzee as her "service animal," and federal and state law create exceptions for service animals in public places under certain conditions, classifying it as such is not required for accommodation under 28 C.F.R. § 35.130(b)(7).[1]

---

[1] For example, A.R.S. § 11-1024(A) prohibits discrimination by any person or entity that operates a public place against individuals with disabilities who use service animals.

- 16 -

On the current record, having the Chimpanzee in her home to retrieve and administer emergency assistance to Pruett is not only unnecessary, it likely is inadequate. If Pruett becomes aware that she needs carbohydrate supplementation and is able to give the Chimpanzee a verbal command, she also would be able to take glucose gel from a pocket or belt pack and spread it inside her mouth without the assistance of the Chimpanzee. She also could call for human assistance to ensure that someone would come if she was not able to stabilize her blood glucose level. In addition to calling 911 and/or her husband, Pruett could contract with an emergency monitoring service to respond in such situations.

If Pruett does not become aware that she needs carbohydrate supplementation and becomes unconscious, there is no evidence that any animal could diagnose whether she was in a hypoglycemic or hyperglycemic condition and render appropriate aid. If she were unconscious, having an animal trained to bring a carbohydrate liquid for her to drink would be at best useless, and at worst dangerous. Moreover, the Chimpanzee is not yet trained to detect when Pruett's blood glucose level is dropping and respond without a verbal command.

Several alternatives to having the Chimpanzee in her home would provide at least as adequate assistance for Pruett. The Tonkean ape Pruett and Sawyer owned was trained to retrieve both carbohydrate supplementation and telephones for her on verbal command. It also was trained to press a medical alert button on Pruett's telephone that summoned emergency assistance. The Tonkean ape was able to detect when she needed carbohydrate supplementation. Pruett could obtain and train another Tonkean ape or another primate that Arizona law would permit her to possess if she keeps it away from the public.

---

However, it is not discriminatory to exclude a service animal from a public place if the animal poses a direct threat to the health or safety of others; the animal fundamentally alters the nature of the public place or the goods, services, or activities provided; or the animal poses an undue burden. A.R.S. § 11-1024(B)

- 17 -

1    Other alternatives include the implantation of a continuous glucose monitor, alone
2 or in conjunction with an insulin pump. Moreover, contracting with an emergency
3 monitoring service and wearing a device to contact them in conjunction with carrying
4 glucose gel and a cell phone in a pocket or belt pack likely would be at least as sufficient
5 to address Pruett's medical needs as having the Chimpanzee near her.
6    Thus, Pruett's requested modification, being allowed to keep the Chimpanzee in
7 her home, is not necessary to prevent discrimination on the basis of disability.

      **B.    The Modifications Pruett Seeks Would Fundamentally Alter the Nature of Arizona Statutes and Regulations Restricting Possession of Restricted Live Wildlife.**

10    The Arizona Legislature has delegated to the Arizona Game and Fish Commission
11 authority to determine which live wildlife may be possessed within the state and to
12 impose conditions under which they may be possessed. A.R.S. § 17-306. The Arizona
13 Game and Fish Commission has determined that chimpanzees represent an actual or
14 potentially significant threat to public health and safety. Arizona wildlife regulations
15 permit possession of chimpanzees and other restricted wildlife only for specific purposes
16 and if certain conditions are met. Ariz. Admin. Code R12-4-417.
17    Pruett contends that the Department was required to conduct an individualized
18 assessment of the Chimpanzee, not merely an individualized assessment of her specific
19 request. The Chimpanzee's previous owner states that it has been completely socialized
20 since its birth. Pruett concedes, however, that the Chimpanzee will grow to be large and
21 strong, its behavior could be unpredictable, and chimpanzees are likely to become
22 aggressive beginning at adolescence. Pruett acknowledges that even if she takes
23 measures, such as castration, to reduce the likelihood that the Chimpanzee will become
24 aggressive, she may not be able to control the Chimpanzee and would need to keep it in
25 an enclosure. She also acknowledges that at some point the Chimpanzee will be too large
26 to live in her home and be used as a service animal. But Pruett's requested modification
27 offers no protection against the possibility that she will not be able to determine the point
28 at which the Chimpanzee is no longer safe until the Chimpanzee already has inflicted

1  harm. Where even Pruett's experts are unable to predict the Chimpanzee's future
2  behavior with any degree of certainty, it would be impossible for the Department to
3  determine that this Chimpanzee poses no threat to Pruett's safety or that of the public.

4  Defendants are responsible for restricting possession of live wildlife that may pose
5  a threat to public health or safety. The modification Pruett seeks, complete waiver for
6  unlimited duration of laws regulating private possession of restricted live wildlife,
7  fundamentally alters the nature of the Arizona statutes and regulations intended to protect
8  the safety of its residents.

### C. The Modifications Pruett Seeks Are NotReasonable.

10  The ADA requires only accommodations that are reasonable. "[T]he
11  accommodation required by the law is limited, not just expanded, by the word
12  'reasonable.'" *McGary*, 386 F.3d at 1270. Where a law is intended to protect the
13  community, an accommodation that threatens the health and safety of the community may
14  be unreasonable. *Id.* Courts generally will not second-guess the public health and safety
15  decisions of state legislatures acting within their traditional police powers, but the ADA
16  and accompanying regulations require courts to ensure that the decision reached by the
17  state authority is appropriate under the law and in light of proposed alternatives.
18  *Crowder*, 81 F.3d at 1485.

19  Pruett has rejected all proposed alternatives to possessing the Chimpanzee in her
20  home. She has not established that possession of the Chimpanzee more adequately meets
21  her disability-related needs than several alternatives. She has not refuted evidence that
22  chimpanzees can be unpredictably aggressive and pose a significant threat to public
23  health and safety. She concedes that even this mild-mannered, affable Chimpanzee could
24  become aggressive and is likely to become too large to keep in her home as a service
25  animal.

26  Therefore, permitting Pruett to possess the Chimpanzee in her home to assist her
27  with obtaining carbohydrate supplementation is not a reasonable accommodation to the
28  Arizona statutes and regulations that do not permit possession of chimpanzees in these

circumstances. *See Young v. City of Claremore*, 411 F. Supp. 2d 1295, 1310 (N.D. Okla. 2005) (requested modification of state law to permit unfettered access to operate golf cart on public streets was unreasonable as a matter of law).

### D. There Is No Genuine Issue as to Any Material Fact, and the Defendants Are Entitled to Judgment as a Matter of Law.

The material facts here are not disputed. Assuming for purposes of these motions for summary judgment that Pruett is "a qualified individual with a disability" under Title II of the ADA and Section 504 of the Rehabilitation Act, as a matter of law, Pruett has not been denied the benefits of a public entity's services, programs or activities or otherwise discriminated against by a public entity by reason of her disability. *See* 42 U.S.C. § 1232. Nor has she been excluded from participation in, denied the benefits of, or subjected to discrimination under any program or activity receiving federal assistance. *See* 29 U.S.C. § 794(a).

Further, Defendants are not required under 28 C.F.R. § 35.130(b)(7) to provide the modification of Arizona wildlife regulations, policies, and/or procedures that Pruett seeks because it is not reasonable, it is not necessary to avoid discrimination on the basis of disability, and it would fundamentally alter the nature of the Arizona service, program, or activity. Therefore, Defendants are entitled to judgment as a matter of law.

IT IS THEREFORE ORDERED that Defendants' Motion to Strike (doc. #113) is denied as procedurally improper.

IT IS FURTHER ORDERED that Plaintiff's Third Amended Motion for Summary Judgment (doc. #99) is denied and Defendants' Motion for Summary Judgment (doc. #100) is granted. The Clerk is directed to enter judgment in favor of Defendants and that Plaintiff take nothing. The Clerk shall terminate this action.

DATED this 9th day of February, 2009.

_____
Neil V. Wake
United States District Judge